UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL ANZOLA,

                                    Plaintiff,

                    -against-

NANCY A. BERRYHILL,
 Acting Commissioner of Social Security,

                                    Defendant.

18cv11217 (VSB) (DCF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:**

In this Social Security action, which has been referred to this Court for a report and

recommendation, plaintiff Daniel Anzola ("Plaintiff") seeks review of the final decision of

defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration

("SSA")[1] ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security

Income ("SSI") under the Social Security Act (the "Act") on the ground that, for the relevant

period, Plaintiff's impairments did not render him disabled under the Act.  Currently before the

Court is Plaintiff's motion, purportedly made pursuant to Rule 56(a) of the Federal Rules of Civil

Procedure, for summary judgment reversing the Commissioner's decision.[2]  Also before the

_____

[1] This Court notes that Andrew M. Saul has now been appointed Commissioner of the
SSA, and recommends that the Court order the substitution of Commissioner Saul's name for
Nancy A. Berryhill's, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] While citing Rule 56, Plaintiff confusingly refers to his motion as a "motion for
summary judgment on the pleadings" (*see* Memorandum of Law in Support of Plaintiff's Motion
for Summary Judgment on the Pleadings, dated July 12, 2019 ("Pl. Mem.") (Dkt. 13)), seemingly
invoking Rule 12(c) (governing motions for judgment on the pleadings).  As Rule 56 is generally
not considered the proper procedural vehicle for challenging a disability determination of the
Commissioner, *see Mersel v. Heckler*, 577 F. Supp. 1400, 1401 n.1 (S.D.N.Y. 1984), this Court
will treat Plaintiff's motion as a motion under Rule 12(c).

Court is the Commissioner's cross-motion, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings affirming the Commissioner's decision.  For the

reasons set forth below, I respectfully recommend that Plaintiff's motion (Dkt. 12) be denied,

that Defendant's motion (Dkt. 14) be granted, and that the decision of the Commissioner be

affirmed.

## BACKGROUND[3]

Plaintiff filed an application for SSI benefits on July 6, 2015 (R. at 58), alleging a

disability onset date of March 1, 2014, based on his having bipolar disorder[4] and asthma[5] (*id.*

at 161).  His claim was denied on October 14, 2015 (*id.* at 70), and, on November 20, 2015,

Plaintiff requested a hearing before an administrative law judge ("ALJ") (*id.* at 76-77).  On

October 17, 2017, ALJ Katherine Edgell held a hearing (the "Hearing"), at which Plaintiff,

represented by counsel, testified.  (*Id.* at 31-53.)  Vocational expert ("VE") Susie Komarov

("Komarov") also testified at the Hearing.  (*Id.* at 53-55.)  In a decision issued on December 5,

2017, ALJ Edgell found that, although Plaintiff had the severe impairments of asthma, obesity,

---

[3] The background facts summarized in this section are taken from the Social Security
Administration Administrative Record (Dkt. 11) (referred to herein as "R." or the "Record").

[4] "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that
causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day
tasks."  *Bipolar Disorder*, NAT'L INST. OF MENTAL HEALTH,
https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last visited Sept. 24,
2019).

[5] Asthma "is a condition in which [a person's] airways narrow and swell and produce
extra mucus."  *Asthma*, MAYO CLINIC, https://www.mayoclinic.org/diseases-
conditions/asthma/symptoms-causes/syc-20369653 (last visited Nov. 26, 2019).  It "can make
breathing difficult and trigger coughing, wheezing and shortness of breath."  *Id.*

diabetes mellitus,[6] obstructive sleep apnea,[7] and bipolar disorder, he had the residual functional capacity ("RFC") to perform medium work, subject to certain limitations, and therefore was not disabled under the Act.  (*Id.* at 18, 20-21, 25.)  Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Appeals Council denied that request on October 12, 2018.  (*Id.* at 1.)  Thereafter, the ALJ's decision became the final decision of the Commissioner.

### A.    Plaintiff's Personal and Employment History

Plaintiff was born on January 4, 1994 and was 21 years old on the alleged onset date of his disability.  (*Id.* at 59.)  Plaintiff testified that he had completed high school and had enrolled in community college classes twice, but each time had had to drop out after only a semester or two because of his bipolar disorder.  (*Id.* at 37.)[8]  He further stated that he had never worked outside the home "on or off the books in any capacity," and that his only source of income was cash given to him by his parents.  (*Id.* at 38, 43.)  The ALJ did not inquire whether Plaintiff had attempted to find work at any point.

---

[6] "Diabetes mellitus refers to a group of diseases that affect how your body uses blood sugar (glucose)."  *Diabetes*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/diabetes/symptoms-causes/syc-20371444 (last visited Nov. 26, 2019).  Symptoms of diabetes include fatigue, irritability, increased hunger or thirst, and weight fluctuations.  *Id.*

[7] Obstructive sleep apnea is the most common type of sleep apnea and "causes breathing to repeatedly stop and start during sleep," resulting in excessive daytime sleepiness, headaches, difficulty concentrating, and mood changes, among other symptoms.  *Obstructive Sleep Apnea*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090 (last visited Nov. 26, 2019).

[8] This account differs slightly from what Plaintiff told psychiatric consultative examiner Dr. Melissa Antiaris – *i.e.*, that he had completed two full years of college.  (*See id.* at 234.)

B.   <u>**Evidence of Mental Impairments**[9]</u>

The relevant period under review on Plaintiff's claim for SSI benefits runs from July 6, 2015, the date on which Plaintiff applied for those benefits, to December 5, 2017, the date of the ALJ's decision.  20 C.F.R. §§ 416.330, 416.335; *Barrie ex rel. F.T. v. Berryhill*, No. 16cv5150 (CS) (JCM), 2017 WL 2560013, at *2 (S.D.N.Y. June 12, 2017) (adopting report and recommendation).

1.   <u>**Dr. Naveed Iqbal (Psychiatrist)**</u>

Dr. Naveed Iqbal treated Plaintiff for his psychiatric conditions on a monthly basis between March 2014 and September 2017.  (*See* R. at 275-395.)  Based on the Record, Plaintiff saw Dr. Iqbal 17 times prior to the relevant period and 23 times during the relevant period. (*See id.*)  Dr. Iqbal was the physician who first diagnosed Plaintiff with bipolar disorder (*id.* at 47) and, based on the frequency of Plaintiff's visits and the absence of any reference in the Record to any other psychiatrist, he appears to have been Plaintiff's primary treater for this and his other psychiatric conditions.

a.   <u>**Treatment Prior to the Relevant Period**</u>

On his initial visit with Dr. Iqbal, on March 21, 2014, Plaintiff's chief complaint was depression, and he reported symptoms of depressed mood, anhedonia,[10] decreased energy, sleep disturbance, decreased motivation, racing thoughts, and restlessness.  (*Id.* at 391.)  The results of

---

[9] As Plaintiff has challenged the ALJ's weighing of the medical opinion evidence only with respect to his mental conditions (*see* Discussion, *infra*, at Section III), this Court has largely omitted evidence in the Record pertaining exclusively to Plaintiff's physical impairments, such as treatment notes from Hudson Valley Hospital (R. at 246-72).  Additional omissions are noted below.

[10] Anhedonia "refers to the reduced ability to experience pleasure" and is "considered to be a core feature of major depressive disorder."  Philip Gorwood, *Neurological Mechanisms of Anhedonia*, 10 DIALOGUES IN CLINICAL NEUROSCIENCE 291, 291 (2008).

a mental status examination during that visit were normal, except that Dr. Iqbal noted that Plaintiff's affect was labile and his mood was depressed.  (*Id.* at 393-94.)[11]  Also at this initial visit, Dr. Iqbal assessed Plaintiff as having a GAF score of 70.[12]  (*Id.* at 395.)

At Plaintiff's next appointment, on April 4, 2014, Dr. Iqbal described him as "still mildly depressed" and prescribed Seroquel[13] 150 mg, twice daily.[14]  (*Id.* at 388, 390.)  Plaintiff was similarly described as having "mild mood lability" or "mild" depression during three of his next five visits with Dr. Iqbal, and it was noted twice that he had "no racing thoughts."  (*Id.* at 373, 376, 379, 385.)  On June 6, 2014, however, Dr. Iqbal mentioned that Plaintiff "seem[ed] to have

---

[11] As discussed further below (*see* Discussion, *infra*, at Section III(A)), Dr. Iqbal's treatment notes are handwritten and, in certain places, difficult to decipher.  (*See, e.g.*, *id.* at 287, 293, 296, 313, 334, 340, 370, 379, 388.)  In its summary of the notes, this Court has referred only to the portions that it is reasonably confident it has interpreted correctly.

[12] A GAF score represents a clinician's overall judgment of the patient's level of psychological, social, and occupational functioning.  GAF scores range from 1 to 100, with 1 being the lowest level of functioning and 100 the highest.  *See* DSM-IV at 32-34.  Scores in the 60's and higher indicate symptoms that are "mild," "transient," "minimal," or "absent."  *Id.*

The DSM-V, however, "has dropped the use of the [GAF] scale."  *Restuccia v. Colvin*, No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (S.D.N.Y. Sept. 22, 2014) (quoting *Mainella v. Colvin*, No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).  In addition, the SSA has stated that a claimant's GAF score "does not have a direct correlation to the severity requirements in [the SSA's] disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50746, 50764-5 (2000).

[13] Seroquel is the brand name for the drug quetiapine.  Quetiapine belongs to a class of drugs called atypical antipsychotics and is used to treat, *inter alia*, "episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder."  *Quetiapine*, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a698019.html (last visited Sept. 28, 2019).

[14] Although it is not clear from Dr. Iqbal's notes that Plaintiff's Seroquel was to be taken twice daily, Plaintiff reported to a consultative examiner, in 2015, that he took it twice a day (*id.* at 234), and said the same during his testimony before the ALJ in 2017 (*id.* at 47).

multiple breakthrough symptoms."[15]  (*Id.* at 382.)  Over the course of these five visits, Dr. Iqbal

gradually increased Plaintiff's Seroquel dose from 150 mg to 600 mg.  (*See id.* at 375, 378, 384,

387.)

During an October 3, 2014 visit, Plaintiff complained of difficulty concentrating, but

reported that his depression was "much less" and that he was generally "feel[ing] much better."

(*Id.* at 370.)  Dr. Iqbal also recorded that Plaintiff had been experiencing more sedation as a side

effect of his increased Seroquel dose.  (*Id.* at 371.)  At additional visits spanning October 2014 to

May 2015, Dr. Iqbal described Plaintiff as having "some mood lability," but recorded few other

symptoms or observations, except that, on some occasions, he noted that Plaintiff had

complained of racing thoughts or insomnia.  (*Id.* at 349, 352, 355, 358, 361, 364, 367.)  At a

February 27, 2015 visit, Dr. Iqbal characterized Plaintiff's "sleep [as] somewhat of a problem."

(*Id.* at 355.)  On March 27, 2015, Plaintiff reported "feeling better" (*id.* at 352), though it seems

that he renewed his insomnia-related complaints in May 2015 (*id.* at 349).

**b.    Treatment During the Relevant Period**

Plaintiff's complaints and Dr. Iqbal's observations remained largely unchanged until a

September 4, 2015 appointment at which Plaintiff exhibited not only "some mood lability," but

also "tangential" speech "with flight of ideas."  (*Id.* at 337.)  Dr. Iqbal also observed "some flight

of ideas," in addition to mood lability, on October 30, 2015.  (*Id.* at 331.)  Plaintiff was described

as "doing relatively well" during a November 7, 2015 visit (*id.* at 328), but was noted as

---

[15] Breakthrough symptoms are characterized by a sudden short-term increase in the
severity of the symptoms of a chronic condition.  *See Breakthrough Pain*, NAT'L CANCER INST.,
https://www.cancer.gov/publications/dictionaries/cancer-terms/def/breakthrough-pain (last
visited Dec. 6, 2019).

exhibiting or reporting[16] decreased socialization and "some thought racing, depression" on November 27 (*id.* at 325).  Following the latter visit, Dr. Iqbal prescribed Wellbutrin[17] 150 mg (*id.* at 327), although it does not appear that the medication was continued thereafter.

During January, February, and March 2016 appointments, Dr. Iqbal described Plaintiff as having "some" mood lability and decreased sleep, but made no other significant observations. (*Id.* at 316, 319, 322.)  On January 8, 2016, Dr. Iqbal stated that Plaintiff was "working on his sleep pattern," and Plaintiff's insomnia-related complaints became less frequent after that point. (*See id.* at 322.)  At a June 3, 2016 visit, Dr. Iqbal made similar findings, but this time increased Plaintiff's Seroquel dose from 600 mg to 800 mg.  (*Id.* at 310, 312.)  This increased dose was continued on June 24, 2016, after Plaintiff reported "feeling better" and having "less mood lability."  (*Id.* at 308-09.)  It appears that Plaintiff's Seroquel was then decreased to 400 mg on August 5, 2016, after Dr. Iqbal noted Plaintiff had "some mood lability" and had just "got[ten] a car."  (*Id.* at 305, 307.)  Dr. Iqbal also recorded that Plaintiff needed a "letter for food stamps" and was "not working yet."  (*Id.* at 305.)

During three further visits in September and October 2016, Dr. Iqbal observed "some mood lability," but noted no other significant symptoms and left Plaintiff's Seroquel prescription unchanged, both following these visits and for the remainder of the relevant period.  (*See id.* at 296, 298-302.)  At a November 25, 2016 appointment, Dr. Iqbal characterized Plaintiff as having "mild mood lability," but noted that "racing thoughts [were] less"; he also seemed to

---

[16] In some of Dr. Iqbal's treatment records, it is not clear whether certain notes represent what Plaintiff reported or what Dr. Iqbal himself observed.

[17] Wellbutrin is the brand name for the drug bupropion.  Bupropion is an antidepressant used to treat depression and related disorders "by increasing certain types of activity in the brain."  *Bupropion*, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a695033.html (last visited Nov. 26, 2019).

indicate that Plaintiff had been sleeping better.  (*Id.* at 293.)  On December 23, 2016, Dr. Iqbal

noted "mild mood lability," but made no other observations.  (*Id.* at 290.)

At a January 27, 2017 visit, Dr. Iqbal appears to have written that Plaintiff had "mood

lability," that he was "still not working," and that he exhibited or reported some decreased

socialization.  (*Id.* at 287.)  At Plaintiff's next visit, on June 2, 2017, Dr. Iqbal observed that

Plaintiff had "a little more energy" and had been "sleeping better," though he continued to have

"mild mood lability."  (*Id.* at 284.)  Similarly, Plaintiff was described as "feeling better" on June

30, 2017, and he told Dr. Iqbal that he intended to begin community college classes soon.  (*Id.*

at 281.)  Dr. Iqbal also stated, at that time, that Plaintiff had "mild mood lability" and "some

anxiety."  (*Id.*)  At his final two recorded visits, in August and September 2017, Plaintiff again

reported that he would be "going to college," and Dr. Iqbal noted that Plaintiff suffered from "no

acute depressive or manic episode[s]."  (*Id.* at 275, 278.)

In addition to the observations described above, Dr. Iqbal conducted a mental status

examination of Plaintiff at almost every visit.  With the exception of Plaintiff's initial

appointment, which was recorded on a different form than all of his other appointments and is

described separately above, Dr. Iqbal consistently found that Plaintiff was alert and oriented; his

speech was coherent, relevant, and logical; his cognition was fair or good; his insight was fair;

his judgment was fair or good; and he was negative for homicidal and suicidal ideation.  (*Id.*

at 275, 281, 284, 287, 293, 296, 299, 305, 308, 310, 313, 316, 319, 322, 325, 328, 331, 334, 337,

340, 343, 346, 349, 352, 355, 358, 361, 364, 367, 370, 373, 376, 382, 385, 388.)  Dr. Iqbal

generally described Plaintiff's mood as exhibiting "some" lability, as "mildly" labile, as simply

"labile," or as "mildly" depressed (*see id.*), although he occasionally characterized it as

"anxious" as well (*id.* at 316, 328, 340).

On September 25, 2017, Dr. Iqbal completed a Medical Source Statement at the request of the SSA. (*Id.* at 431-38.) The form provided to Dr. Iqbal asked him to opine about the extent of Plaintiff's limitations, if any, in 10 different areas: understanding and remembering simple instructions; carrying out simple instructions; making judgments on simple work-related decisions; understanding and remembering complex instructions; carrying out complex instructions; making judgments on complex work-related decisions; interacting appropriately with the public; interacting appropriately with supervisors; interacting appropriately with coworkers; and responding appropriately to usual work situations and to changes in a routine work setting. (*Id.* at 431-32.) Dr. Iqbal opined that Plaintiff had "marked" limitations[18] in each of these areas. (*Id.*) When asked to "[i]dentity the factors (e.g., the particular medical signs, laboratory findings, or other factors . . . ) that support[ed] [his] assessment," Dr. Iqbal responded, "[d]epressed mood, anhedonia, decreased energy, [ ] sleep disturbance, decreased motivation, racing thoughts and restlessness." (*Id.* at 432.)

Also included in the Record is a brief letter written by Dr. Iqbal regarding Plaintiff's conditions, which Plaintiff characterizes as a "summary of his treatment." (*Id.* at 242; Pl. Mem., at 4.) It is not clear whether the one-paragraph letter was actually meant to summarize Dr. Iqbal's treatment of Plaintiff, and it is similarly unclear whether the intended recipient was the SSA (as opposed to Plaintiff's college), as, on its face, the letter is characterized as a "request" that Plaintiff be allowed "a reasonable amount of extra time to study, take exams and send in homework." (R. at 242.) In any event, Dr. Iqbal stated in the letter that Plaintiff had been diagnosed with bipolar disorder and major depressive disorder, that he experienced

---

[18] A "marked" limitation is defined by the SSA as a "serious limitation" resulting in "a substantial loss in the ability to effectively function." (*Id.* at 431.)

"depressed mood, anhedonia, decreased energy, sleep disturbance, decreased motivation, racing thoughts and restlessness,"[19] and that he was prescribed Seroquel.  (*Id.*)

## 2.   Dr. Carol Allen and Nurse Practitioner Kenneth Sax

Plaintiff saw Dr. Carol Allen once in February 2016 and family nurse practitioner Kenneth Sax ("Sax") (whom Plaintiff described as his "primary care doctor" (*id.* at 46)), both of HRHCare Community Health ("Community Health"), six times in 2017 (*see id.* at 398-423).  As Plaintiff saw Dr. Allen and Sax primarily for physical conditions (particularly diabetes (*see id.* at 46)), this Court mentions their treatment records only to note that, when, as part of depression screening conducted during four of his Community Health appointments, Plaintiff was asked whether he had been bothered by "[l]ittle interest or pleasure in doing things" or "[f]eeling down, depressed or hopeless" during the two weeks prior to each appointment, he answered "no" to both questions on all four occasions.  (*Id.* at 398, 404, 417, 420.)[20]  In a questionnaire completed by Dr. Allen at the request of the SSA, she opined that Plaintiff's mental status was "normal" (*see id.* at 220), although there is no record of either her or Sax's performing any mental examinations apart from the depression screening described above.

---

[19] These symptoms are identical to those Plaintiff reported to Dr. Iqbal when he presented for an initial visit in March 2014 (*id.* at 391) and to those listed by Dr. Iqbal in his Medical Source Statement (*id.* at 432).

[20] Dr. Allen filled out a questionnaire on July 17, 2015 at the request of the SSA, but her responses related only to Plaintiff's physical conditions.  (*See id.* at 218-22; *see also supra*, at n.9.)  Furthermore, Dr. Allen checked a box on the form indicating that she "[could not] provide a medical opinion regarding [Plaintiff's] ability to do work-related activities."  (R. at 222.)

### 3.   Psychiatric Consultative Examination
### by Dr. Melissa Antiaris (Psychiatrist)[21]

On September 18, 2015, Plaintiff was seen by Dr. Melissa Antiaris for a consultative psychiatric examination at the request of the SSA.  (*Id.* at 233-37.)  Plaintiff reported a number of symptoms to Dr. Antiaris, including difficulty falling asleep, oversleeping, depressive symptoms, lack of motivation, feelings of hopelessness or worthlessness, "loss of usual interest" in certain activities, anxiety-related symptoms, racing thoughts, restlessness, some manic symptoms, such as occasionally erratic behavior, and difficulty concentrating.  (*See id.* at 234-35.)  Regarding his depressive symptoms, Plaintiff stated that he would "have several weeks of improved mood, then he [would] drop like a 'bomb,'" although he reported no hospitalizations for any of his mental conditions.  (*Id.* at 234.)  Upon a mental status examination, Dr. Antiaris found Plaintiff's appearance "appropriate"; his speech "[f]luent and clear"; his thought processes "[c]oherent and goal[-]directed"; his affect "appropriate"; his mood "euthymic";[22] his attention and concentration "[m]ildly impaired"; his recent and remote memory skills "[m]ildly impaired due to limited intellectual functioning"; his intellectual functioning "in the below average range"; and his insight and judgment "fair."  (*Id.* at 235-36.)

In her Medical Source Statement, Dr. Antiaris found that Plaintiff had "no limitations in [his] ability to follow and understand simple directions and instructions and [to] perform simple

_____

[21] Plaintiff also underwent an internal medicine consultative examination on September 18, 2019, but the findings made during that examination are relevant only to Plaintiff's physical conditions, and thus the consultant's report has been omitted from the Court's summary of the medical evidence in the Record.  (*See id.* at 223-31; *see also supra*, at n.9.)

[22] Euthymia "often is used to refer to a state in patients with a bipolar disorder that is neither manic nor depressive but in between, associated with adaptive behavior and enhanced functioning."  *Euthymia,* APA DICTIONARY OF PSYCHOL., https://www.dictionary.apa.org/euthymia (last visited Sept. 23, 2019).

tasks independently." (*Id.* at 236.) She also found that Plaintiff was "mildly limited in his ability to maintain attention and concentration and [to maintain] a regular schedule"; "mildly limited in his ability to learn new tasks and perform complex tasks independently"; "mildly limited in his ability to make appropriate decisions"; and "moderately limited in his ability to relate adequately with others and appropriately deal with stress." (*Id.*) She further stated that at least some of Plaintiff's "[d]ifficulties [were] caused by lack of motivation." (*Id.*) Dr. Antiaris concluded her report by saying that Plaintiff had "some psychiatric concerns," but that the symptoms he reported and/or exhibited "[did] not appear to be significant enough to interfere with [his] ability to function on a daily basis." (*Id.* at 237.)

### 4. <u>Report of State Agency Medical Consultant Dr. H. Ferrin</u>

On October 14, 2015, state agency medical consultant Dr. H. Ferrin submitted a report containing his opinions regarding Plaintiff's mental and physical limitations. (*Id.* at 62-69.) Dr. Ferrin did not examine Plaintiff, but instead based his opinions on the reports of the (physical and psychiatric) consultative examinations performed on September 18, 2105. (*See id.*) Dr. Ferrin did not have access to Dr. Iqbal's treatment notes when he prepared his report. (*Id.* at 62.)

Dr. Ferrin opined that Plaintiff's understanding and memory were not significantly limited, but that he had some "sustained concentration and persistence limitations"; in particular, Dr. Ferrin stated that Plaintiff was moderately limited in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.* at 65-66.) He also found that Plaintiff had "social interaction limitations"; most notably, in this area, he opined that Plaintiff was moderately limited in his "ability to accept instructions and

respond appropriately to criticisms from supervisors." (*Id.* at 66.)  Finally, Dr. Ferrin opined that

Plaintiff had "adaptation limitations" and was moderately limited in his "ability to respond

appropriately to changes in the work setting" and in his "ability to set realistic goals or make

plans independently of others." (*Id.* at 66-67.)

While Dr. Ferrin concluded that, in light of his various impairments, Plaintiff generally

had moderate limitations in social functioning (*id.* at 63), Dr. Ferrin also concluded that the

moderate difficulties that Plaintiff had exhibited in certain other areas were not sufficient to

result in more than "mild" overall limitations in his activities of daily living and in his ability to

maintain concentration, persistence, or pace (*id.*).

### C.      Plaintiff's Testimony Before the ALJ[23]

In his testimony before the ALJ in October 2017, Plaintiff stated that he lived with his

mother and grandmother in Pittsfield, New York (*id*. at 34-35); that his father lived in New York

City (*id*. at 44); and that Plaintiff took the Metro North train to visit his father (*id*.).  Plaintiff

described his daily activities – which consisted of browsing the internet, reading, or playing

video games – as largely confined to his home or a friend's house, and stated that he was "not an

outside person." (*Id.* at 41-42.)  He stated that he "[v]ery rarely" drove by himself (though he

did have access to a car) and typically did not run errands. (*Id.* at 36, 42.)  Plaintiff said he did

not go out to eat frequently, but, when he did, he typically went with a friend, his mother, or his

grandmother. (*Id.* at 42.)  The ALJ also asked about Plaintiff's weight and any exercise in which

he regularly engaged.  Plaintiff responded that he "[had] always been a little obese" (*id.* at 36),

but that he did have a routine of doing 10 push-ups, crunches, squats, and going up and down

---

[23] This Court has summarized only the Hearing testimony that is relevant to Plaintiff's
mental impairments. (*See supra*, at n.9.)

"little steps" (*id.* at 43-44) – exercise he described as "not intensive," but "just like regular maintenance" (*id.* at 44).

With respect to his mental impairments, specifically, Plaintiff described his symptoms as "exhaustion, sleep[,] depression, [and] concentration issues" and "difficulties talking with people," as well as stress and anxiety.  (*Id.* at 38-39.)  Plaintiff recounted that he had dropped out of community college for the second time roughly a month before the Hearing because he "couldn't keep the schedule," and that he had previously dropped out four years earlier following a "bipolar breakout."  (*Id.* at 37.)  Additionally, Plaintiff stated that "[s]leep [was] a humongous problem for [him]."  (*Id.* at 39.)  He testified that the number of hours he typically slept each night varied widely, but that, generally, he fell asleep very late and often woke up in the afternoon.  (*Id.* at 39-40.)  Although not clearly a result of his insomnia and/or sleep apnea,[24] Plaintiff further stated that he was "always exhausted," and that this prevented him from doing chores around the house or cooking breakfast for himself.  (*Id.* at 41.)

Plaintiff also testified that he had difficulty concentrating, such that he could not "stay doing one thing very long" before having to "stand up and move around."  (*Id.*)  He explained, for example, that, when he would attempt to read something, he could only get through "like a couple of pages [before he] just want[ed] to . . . burst out of [his] seat."  (*Id.* at 42.)

---

[24] Plaintiff may have had both of these conditions.  His testimony refers to difficulty falling asleep, which this Court understands to relate to insomnia.  Dr. Iqbal, in contrast, frequently referred to Plaintiff's issues with "sleep disturbance" (*see* Background, *supra*, at Section B(1)), which may have related to sleep apnea, *see Insomnia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/insomnia/symptoms-causes/syc-20355167 (last visited Nov. 27, 2019); *see also supra*, at n.7.  Indeed, following a November 2015 appointment, Dr. Iqbal noted that Plaintiff "ha[d] sleep apnea" and "need[ed] to have [a] sleep study" done. (R. at 327.)

14

As noted above, Plaintiff testified that he had at least some social interaction with one or more friends, which usually involved playing video games and sometimes going to friend's house to do so, although it is unclear how many people Plaintiff socialized with regularly.  (*See id.* at 42.)  While Plaintiff stated that he did not use social media, he appears to have made a friend online while playing a multi-player video game and to have remained friends with this person for a "long time."  (*See id.* at 45.)  In response to questions from his attorney, Plaintiff denied that he "lash[ed] out" at others because of his mood fluctuations, but he did admit that he often had a "terrible attitude" (*id.* at 50) and that, if he were "having a bad day" and his "symptoms [were] out of control," he would "bunker[] down" and not leave the house, even to see a friend (*id.* at 51).  When asked, specifically, whether he had ever lashed out at one of the friends with whom he played video games, Plaintiff responded that he had "tr[ied] to avoid conflict [in] that area" and that he "[didn't] want to have conflicts with people [he knew]."  (*Id.*)

### D. Function Report Submitted by Plaintiff's Mother

In addition to Plaintiff's testimony, the ALJ gathered information about Plaintiff's lifestyle and daily activities from a form Function Report completed by his mother, Candida Fernandez ("Fernandez").  (*See id.* at 175-83.)  In the Report, Fernandez stated that, prior to Plaintiff's becoming "sick" in the second year of college, he had been able to maintain a regular schedule, attend college, and practice martial arts "with enthusiasm."  (*Id.* at 176, 179.)  She stated that, since the onset of his symptoms, Plaintiff had been unable to "sleep without medication," had "[had] problem[s] socializing," had gone out less, and had not been able to read as much.  (*Id.* at 176, 178-80.)  Fernandez also indicated that Plaintiff had difficulty "retain[ing] his focus for long periods."  (*Id.* at 181.)  Although Fernandez wrote that "stress trigger[ed] [Plaintiff's] manic episodes and depression," she denied that he had trouble remembering things,

15

and, in response to a question on the form as to whether Plaintiff had "any problems getting along bosses, teachers, police, landlords, or other people in authority," she answered "no," noting that her son was "very sweet and kind."  (*Id.* at 182.)

E.      **The VE's Testimony Before the ALJ**

At the Hearing, the ALJ briefly heard from VE Komarov.  (*See id.* at 53-55.)  Noting that Plaintiff had no past relevant work, the ALJ asked the VE to opine on whether jobs existed in the national economy for a hypothetical person of Plaintiff's vocational and educational profile who could perform medium work, except that the person could not be exposed to concentrated respirator irritants, could stand, walk, or climb stairs for up to six hours during an eight-hour day, could not engage in significant decision-making or multi-tasking, and could only occasionally interact with others.  (*Id.* at 53-54.)  Citing the Dictionary of Occupational Titles ("DOT"), the VE identified three jobs that would be available to the hypothetical individual described by the ALJ:  hand packager (DOT 920.587-018), warehouse worker (DOT 922.687-058), and marker (DOT 369.687-026).  (R. at 54.)

In response to additional questions by the ALJ, the VE opined that none of these jobs would be available to the described individual, if that individual would be off-task for more than 25 percent of a typical workday or was limited to less than occasional interaction with anyone, including supervisors.  (*Id.*)

E.      **The Current Action and the Motions Before the Court**

Plaintiff, through counsel, filed a Complaint in this action on December 3, 2018.  (*See* Complaint, dated Nov. 30, 2018 ("Compl.") (Dkt. 1).)  In his Complaint, Plaintiff claims that he was entitled to "a period of disability and disability insurance benefits" (*id.* ¶ 3), although Plaintiff actually applied for SSI, not disability insurance benefits (*see* R. at 142; *see also*

Pl. Mem.).  The Complaint also does not identify which physical or mental impairments rendered

Plaintiff disabled, and simply alleges, without further elaboration, that the ALJ's decision was

"not supported by substantial evidence and applie[d] an erroneous standard of law."  (Compl.

¶ 5.)

On July 12, 2019, Plaintiff filed his motion for summary judgment (Dkt. 12) – which, as

noted above (*see supra*, at n.2), this Court construes as a motion for judgment on the pleadings in

his favor – together with a supporting memorandum of law (*see* Pl. Mem.).  On September 10,

2019, Defendant filed a cross-motion for judgment on the pleadings in favor of the

Commissioner (Dkt. 14), supported by a memorandum of law (Memorandum of Law in Support

of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's

Motion for Summary Judgment, dated Sept. 10, 2019 ("Def. Mem.") (Dkt. 15)).  On October 4,

2019, Plaintiff filed a reply brief.  (*See* Plaintiff's Response to Defendant's Cross Motion for

Judgment on the Pleadings, dated Oct. 4, 2019 ("Pl. Reply") (Dkt. 18).)

<u>**DISCUSSION**</u>

I. <u>**APPLICABLE LEGAL STANDARDS**</u>

A. <u>**Judgment on the Pleadings**</u>

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes

'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC),

2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*,

901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by

considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*,

842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's

decision is final, provided that the correct legal standards are applied and findings of fact are

supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

B.      **The Five-Step Sequential Evaluation**

To be entitled to disability benefits under the Act, a claimant must establish his or her

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is

considered disabled only if the individual's physical or mental impairments are of such severity

that he or she is not only unable to do his or her previous work, but also cannot, considering his

or her age, education, and work experience, engage in any other kind of substantial gainful work

that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in

the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§ 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Throughout the

inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical

facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or

disability testified to by the claimant or others; and (4) the claimant's educational background,

age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is

engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If not, at the second step,

the ALJ determines whether the claimant has a "severe" impairment or combination of

impairments that significantly limits his or her physical or mental ability to do basic work

activities.  *Id.* §§ 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment,

then the third step requires the ALJ to determine whether this impairment meets or equals an

impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App'x 1. *Id.* § 416.920(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id*. § 416.920(d).

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a, to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three.[25] *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the claimant is found to have a "medically determinable mental impairment," then the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," and then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 416.920a]," which specifies four broad functional areas:  (1) understanding, remembering, or applying information; (2) interacting with others; (3)  concentration , persistence, or pace; and (4) adapting or managing oneself. 20 C.F.R. §§ 416.920a(b), (c)(3). Functional limitations in these areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme." *Id.* § 416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's residual functional capacity, or ability to perform physical and mental work activities on a sustained basis. *Id.* § 416.945. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past

---

[25] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App'x 1) used to evaluate claims involving mental disorders under Title II of the Act, effective January 17, 2017. These revisions impacted various relevant portions of 20 C.F.R. § 416.

relevant work." *Id.* § 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her

past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's

RFC, age, education, and work experience, the claimant is capable of performing "any other

work" that exists in the national economy.  *Id.* §§ 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden

of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (citation omitted).

At the fifth step, the burden shifts to the Commissioner to "show that there is work in the

national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306

(2d Cir. 2009).  The Commissioner must establish that the alternative work "exists in significant

numbers" in the national economy and that the claimant can perform this work, given his or her

RFC and vocational factors.  20 C.F.R. § 416.960(c)(2).

Where the claimant suffers only from exertional impairments, the Commissioner can

satisfy this burden by referring to the Medical-Vocational Guidelines (the "Grids"), set out in

20 C.F.R. Pt. 404, Subpt. P, App'x 2.  Where, however, the claimant suffers from non-exertional

impairments that "'significantly limit the range of work permitted by his [or her] exertional

limitations,'" the ALJ is required to consult with a vocational expert," rather than rely

exclusively on these published Grids.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)

(quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (citations omitted)).  "A

nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an

'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows

a claimant's possible range of work as to deprive him of a meaningful employment

opportunity.'"  *Id*. at 411 (quoting *Bapp*, 802 F.2d at 605-06).

### C.   The Treating Physician Rule

Under the so-called "treating physician rule,"[26] the medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).  "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. § 416.902.  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 416.927(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (summary order).

An ALJ must make reasonable efforts to obtain a report from the claimant's treating physician, "even when the treating physician's underlying records have been produced." *Paredes v. Comm'r of Soc. Sec.*, No. 16cv00810 (BCM), 2017 WL 2210865, at *17 (S.D.N.Y. May 19, 2017).  When, however, no treating physician opinion is made available despite such efforts by the ALJ, the rule requiring deference to a treating physician does not apply.  *See id.* ("An ALJ cannot, of course, pay deference to the opinion of the claimant's treating physician if no such opinion is in the record.").

---

[26] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

Normally, a consultative physician's opinion is entitled to "little weight."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Marcano v. Berryhill*, No. 16cv08033 (DF), 2018 WL 2316340, at *18 (S.D.N.Y. Apr. 30, 2018).  This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day."  *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citations omitted).  The opinions of consultative physicians, though, "can constitute substantial evidence in support of the ALJ's decision" when the opinion of a claimant's treating physician is properly discounted or cannot be obtained.  *Sanchez v. Comm'r of Soc. Sec.*, No. 15cv4914 (PGG) (JCF), 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted*, 2017 WL 979056 (Mar. 13, 2017).

### D.     Duty To Develop the Record

"Whether the ALJ has met his duty to develop the record is a threshold question.  Before reviewing whether the Commissioner's final decision is supported by substantial evidence. . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record."  *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261-62 (S.D.N.Y. 2016) (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig*, 218 F. Supp. 3d at 262 (noting that "[r]emand is appropriate where this

duty is not discharged").  "[W]here there are deficiencies in the record, an ALJ is under an

affirmative obligation to develop a claimant's medical history 'even when the claimant is

represented by counsel.'"  *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from your own
> medical sources when you give us permission to request the
> reports. . . .  'Every reasonable effort' means that we will make an
> initial request for evidence from your medical source and, at any
> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one followup
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 416.912(d), (d)(1).  "[I]f the documents received lack any necessary information,

the ALJ should recontact the treating physician."  *Oliveras ex rel. Gonzalez v. Astrue*,

No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report and

recommendation adopted*, 2008 WL 2540816 (June 25, 2008); 20 C.F.R. § 416.912(e).  The ALJ

also has the authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C.

§ 405(d), but is not required to subpoena medical records if they are not received following two

ordinary requests, *Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at *5

(E.D.N.Y. May 2, 2017); 20 C.F.R. § 416.1450(d)(1).

The SSA regulations further explain that a claimant's "complete medical history" means

the records of his or her "medical source(s)."  20 C.F.R. § 416.912(d)(2).  If the information

obtained from medical sources is insufficient to make a disability determination, or if the ALJ is

unable to seek clarification from treating sources, the regulations also provide that the ALJ

should ask the claimant to attend one or more consultative evaluations.  *Id.* §§ 416.912(e),

416.917.

Where there are no "obvious gaps" in the record and where the ALJ already "possesses a 'complete medical history,'" the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5.

## II.   THE ALJ'S DECISION

On December 5, 2017, ALJ Edgell issued her decision, finding that Plaintiff was not disabled for purposes of the Act and did not qualify for SSI.  (R. at 25.)  In rendering her decision, the ALJ applied the five-step sequential evaluation.

### A.   Steps One Through Three of the Sequential Evaluation

At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity, *see* 20 C.F.R. §§ 416.971, *et seq.*, since the date of his SSI benefits application, July 6, 2015 (R. at 18).

At Step Two, the ALJ found that Plaintiff had the severe impairments of asthma, obesity, diabetes mellitus, obstructive sleep apnea, and bipolar disorder.  (*Id.*; 20 C.F.R. § 416.920(c).) The ALJ determined that these impairments were severe because they significantly limited Plaintiff's ability to perform basic work activities.  (R. at 18.)  The ALJ also found that Plaintiff had the non-severe impairment of a pilonidal cyst.  (*Id.*)  According to the ALJ, this condition was non-severe, because it "establishe[d] only a slight abnormality, . . . which would have no more than a minimal effect on an individual's ability to perform basic work activities," and "the record [did not] indicate any functional limitations" resulting from Plaintiff's pilonidal cyst. (*Id.*)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App'x 1.  (*Id.* at 18-19.)  The ALJ specifically considered

Sections 3.03 ("Asthma") and 12.04 ("Depressive, bipolar and related disorders") of the

Appendix, and also considered Plaintiff's obesity in accordance with SSR 02-01, while noting

that obesity was no longer a listed impairment.  (*Id.* at 19-20.)

With respect to Section 12.04, the ALJ employed the required "special technique" (*see*

Discussion, *supra*, at Section I(B)) and determined that Plaintiff had a mild limitation in

understanding, remembering, or applying information; a moderate limitation in interacting with

others; a moderate limitation in concentrating, persisting, and maintaining pace; and a moderate

limitation in adapting or managing himself (R. at 19-20)  As, according to the ALJ, Plaintiff's

mental impairments did not result in at least two marked or one extreme limitation, the criteria of

Paragraph B[27] of Section 12.04 were not met, and the ALJ concluded that Plaintiff's impairments

did not meet or medically equal one of the impairments in the Listing.  (*Id.* at 20.)

**B.     The ALJ's Assessment of Plaintiff's RFC**

The ALJ found that Plaintiff had the RFC to perform medium work, *see* 20 C.F.R.

§ 416.967(c), except that Plaintiff was limited to standing, walking, or climbing stairs for only

six hours in an eight-hour work day, could not be exposed to concentrated respiratory irritants,

was limited to no significant decision-making or multi-tasking, and could only occasionally

interact with others.  (R. at 20-21.)  In making this determination, the ALJ found that Plaintiff

had medically determinable conditions that could be expected to produce the symptoms Plaintiff

had described, but that "[Plaintiff's] statements concerning the intensity, persistence and limiting

---

[27] Paragraph B of Listing 12.04 provides that a mental impairment may meet the severity of the Listing if the impairment, in addition to being characterized as a condition specifically listed in Paragraph A, "result[s] in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning" described in 20 C.F.R. § 416.920a(c)(2).  20 C.F.R. Pt. 404, Subpt. P, App'x 1; *see also* Discussion, *supra*, at Section I(B).

effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 21.)

The ALJ first briefly summarized Plaintiff's Hearing testimony and the Function Report completed by Plaintiff's mother. (*Id.*) The ALJ accorded Plaintiff's mother's "opinion" some weight, "noting that Ms. Fernandez lived with [Plaintiff] and observed him every day." (*Id.*)

The ALJ then turned to the medical opinion evidence in the Record, noting first that, when Plaintiff presented to Dr. Allen, Plaintiff had a "normal mental status," and that Dr. Allen had declined to opine as to Plaintiff's work ability. (*Id.* at 22.)

The ALJ then weighed the opinion of psychiatric consultative examiner Dr. Antiaris, giving her opinion "some weight" based on her having an "applicable specialty" and her familiarity with the disability program. (*Id.*) The ALJ further stated that Dr. Antiaris's "clinical findings [were] consistent with treatment records noting mostly mild findings." (*Id.*)

Turning to those records, the ALJ broadly summarized Dr. Iqbal's treatment notes from 2014 to 2017 as "indicat[ing] that [Plaintiff] was only mildly depressed, with occasional mild mood lability, and problems sleeping," and noted that, at his initial visit, Plaintiff was given a GAF score of 70.[28] (*Id.* at 23.) The ALJ also described Dr. Iqbal's treatment notes as showing that Plaintiff "was consistently oriented to person, place, and time, with fair insight and judgment." (*Id.*) The ALJ pointed to a handful of instances in which Plaintiff had reported symptoms such as "mood lability, insomnia, and decreased socialization," but also noted that, on other, subsequent occasions, Plaintiff had reported "[feeling] better," having "more energy," or experiencing "better sleep." (*Id.*)

---

[28] The ALJ later noted that she had given "little weight" to this GAF score, as GAF scores, standing alone, are generally "vague, one-time assessment[s] of [a] claimant's symptomology, and do not represent the claimant's overall functioning." (*Id.* at 24.)

While noting that Dr. Iqbal had an applicable specialty and a long treatment history with Plaintiff, the ALJ accorded only "slight weight" to his opinion that Plaintiff was markedly limited in all relevant categories of mental functioning.  (*Id.*)  The ALJ reasoned that such severe limitations were "not well supported by [the] rationale" accompanying his opinion and not consistent with Dr. Iqbal's "treatment notes and mental status examinations, which consistently reported that . . . the majority of [Plaintiff's] symptoms were mild."  (*Id.*)  The ALJ also found that the marked limitations described by Dr. Iqbal in his Medical Source Statement were contradicted by Plaintiff's "conservative level of care[] and [Plaintiff's] testimony of activities of daily living."  (*Id.*)  In spite of these inconsistencies, the ALJ indicated that she had, "[n]onetheless," considered Dr. Iqbal's opinion "in limiting the claimant," as described in his RFC.  (*Id.*)

Finally, the ALJ briefly considered the opinion of medical consultant Dr. Ferrin that Plaintiff had mild or moderate limitations in certain areas.  (*See id.* at 23-24; Background, *supra*, at Section B(4).)  The ALJ gave Dr. Ferrin's opinion "some weight," noting his specialty, his familiarity with the disability program, and the fact that "[h]is opinion [was] generally consistent with treatment records and the [RFC]."  (R. at 24.)

In formulating Plaintiff's RFC, the ALJ found that, while Plaintiff had "alleged severe restrictions in his ability to focus, concentrate, pay attention, and be around others," those allegations were not supported by the medical evidence, which, in the ALJ's view, "contradicte[d] an inability to perform medium unskilled tasks."  (*Id.*)  The ALJ several times suggested that the limitations that she had incorporated into Plaintiff's RFC – such as limiting Plaintiff to no significant decision-making or multi-tasking and only occasional interaction with others (*id.* at 20-21) – were meant to give Plaintiff "the benefit of the doubt" (*id.* at 24), even

28

when the results of Dr. Antiaris's examination and Dr. Iqbal's treatment notes did not necessarily

suggest that Plaintiff was so limited (*see id.* at 22 ("[G]reater limitations [than those found by

Dr. Antiaris] are assessed in light of [Plaintiff's] history, [his] testimony and the reports of

Dr. Iqbal.")).

      **C.**     **Steps Four and Five of the Sequential Evaluation**

As the ALJ found, based on Plaintiff's benefits application and testimony, that he had no

past relevant work, the ALJ bypassed Step Four and proceeded to Step Five.  (*Id.* at 24.)  Based

on the testimony of the VE that jobs existed in the national economy for someone with Plaintiff's

abilities and limitations, the ALJ concluded that Plaintiff was capable of working and was

therefore not disabled under the Act during the relevant period.  (*Id.* at 24-25.)

**III.**    **REVIEW OF THE ALJ'S DECISION**

In his moving papers, Plaintiff makes only one argument:  that the ALJ erred by "fail[ing]

to accord proper weight to the various physician's [sic] opinions"; specifically, the opinions of

Drs. Iqbal, Antiaris, and Ferrin.  (Pl. Mem., at 7-8.)  As all of these physicians' opinions pertain

solely to Plaintiff's mental impairments, this Court assumes that Plaintiff is not challenging any

of the ALJ's determinations regarding his physical impairments.  With respect to the opinion of

Dr. Iqbal, Plaintiff argues that it "should have been accorded great, if not controlling, weight,"

invoking the treating physician rule.  (*Id.*, at 9.)  Plaintiff contends that the ALJ's failure to

accord it such weight – as well as her allegedly erroneous weighing of the opinions of

Drs. Antiaris and Ferrin – was based on her misreading of Dr. Iqbal's treatment notes, which,

according to Plaintiff, reveal much more serious symptoms than those recognized by the ALJ.

(*See id.*, at 8.)  In response, Defendant argues that the ALJ properly assigned Dr. Iqbal's opinion

less than controlling weight because it "strongly conflicted with other evidence of record, most

notably, Dr. Iqbal's own treatment notes, which repeatedly documented that [P]laintiff's mental health symptoms were mild." (Def. Mem., at 17.) Defendant also asserts that the ALJ properly weighed the opinions of Drs. Antiaris and Ferrin. (*Id.*, at 18-19.) Upon a careful review of the evidence in the Record, particularly Dr. Iqbal's treatment notes, this Court concludes that the ALJ articulated good reasons for discounting Dr. Iqbal's opinion, appropriately weighed the other medical opinions in the Record, and supported her RFC determination with substantial evidence.

**A. The ALJ's Failure To Request More Legible Notes from Dr. Iqbal Does Not Warrant Remand.**

As a threshold matter, this Court acknowledges Plaintiff's observation that not all of Dr. Iqbal's treatment notes are legible. (*See* Pl. Mem., at 7 (referring to those notes as "somewhat illegible"); *id.*, at 8 (stating that "there is a significant portion of Dr. Iqbal's notes that are illegible").) Indeed, it is true that at least some of Dr. Iqbal's handwritten notes, from some of Plaintiff's visits, are difficult to decipher (*see, e.g.*, R. at 287, 293, 296, 313, 334, 340, 370, 379, 388), and the Record contains no indication that the ALJ ever requested that Dr. Iqbal provide typewritten copies of the most unreadable entries, or otherwise sought clarification of any illegible portions of the treatment notes.

Courts in this Circuit have often treated a failure to obtain legible notes from a provider – particularly when that provider's notes and opinions are crucial to the case – as a failure to develop the record. *See, e.g.*, *Miller v. Barnhart*, No. 03cv2072 (MBM), 2004 WL 2434972, at *9 (S.D.N.Y. Nov. 1, 2004) (collecting cases); *McClinton v. Colvin*, No. 13cv8904 (CM) (MHD), 2015 WL 5157029, at *25 (S.D.N.Y. Sept. 2, 2015), *report and recommendation adopted*, 2015 WL 6117633 (Oct. 16, 2015) (Memo Endors.); *Guarnari v. Berryhill*, No. 16-cv-5868 (KAM), 2019 WL 1865195, at *16-17 (E.D.N.Y. Apr. 24, 2019); *Villa v.*

*Colvin*, No. 14-CV-00463 (MAT), 2016 WL 1054757, at \*5-6 (W.D.N.Y. Mar. 17, 2016). Although Plaintiff has not argued that the ALJ in this case failed to develop the Record, "this Court is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty." *Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at \*7 (S.D.N.Y. Feb. 15, 2019).

In this instance, despite the legibility issues presented by Dr. Iqbal's notes, this Court finds that the ALJ was not required to take additional steps to develop the Record.  Having reviewed Dr. Iqbal's handwritten treatment notes in their entirety, this Court finds that only a small percentage of them are truly illegible, that the few entries that are largely illegible still include at least portions that can be deciphered, and that the notes that are readable are highly consistent over the entire period of Plaintiff's treatment.  Although Plaintiff contends that "it is clear there are more to [Dr. Iqbal's] notes than just notations of mildly labile mood and mild depression" (Pl. Mem., at 7-8), such notations are, in fact, what most of Dr. Iqbal's notes reflect, and this Court does not find it reasonable to assume that the handful of illegible entries all contain significantly different findings.  Furthermore, even if those entries, if deciphered, would "reveal more severe symptoms," as Plaintiff seems to suggest (*id.*, at 8), they would be too few in number to outweigh the import of the substantial majority of Dr. Iqbal's notes that are legible. For these reasons, this Court will not recommend remand for development of the Record, but rather will proceed to an analysis of the ALJ's decision on the merits.

## B.   The ALJ Did Not Err in the Weight She Assigned to the Medical Opinions in the Record.

As discussed above, the ALJ's decision to assign only slight weight to the opinion of Dr. Iqbal – which consisted of a Medical Source Statement on which Dr. Iqbal checked the box indicating a "marked" limitation in every listed category of mental functioning (*see* Background,

*supra*, at Section B(1)(b)) – was based primarily on her assessment that his opinion was inconsistent with his own treatment notes (*see* Discussion, *supra*, at Section II(B)).  These treatment notes make up the bulk of the non-opinion medical evidence in the Record, and they also informed the ALJ's decisions with respect to the opinions of Drs. Antiaris and Ferrin.  (*See, e.g.*, R. at 23 (ALJ noting that Dr. Antiaris's opinion was consistent with Dr. Iqbal's treatment notes).)  Therefore, the question of whether the ALJ assigned an appropriate amount of weight to each of the medical opinions in the Record depends largely on the reasonableness of her interpretation of Dr. Iqbal's treatment notes.  This Court, having reviewed the notes, finds that the ALJ's interpretation was well-supported, and that the corresponding weight she assigned to the medical opinions was not erroneous.

### 1. The ALJ Cited Good Reasons for Discounting Dr. Iqbal's Opinion That Plaintiff Suffered from "Marked" Mental Limitations.

#### a. Dr. Iqbal's Opinion Is Inconsistent with His Treatment Notes.

As an initial matter, the parties and the ALJ appear to be in agreement that Dr. Iqbal qualified as a treating physician under the treating physician rule.  (*See* Pl. Mem., at 9; Def. Mem., at 17.)  Indeed, the ALJ properly considered Plaintiff's long history with Dr. Iqbal and noted that Dr. Iqbal "ha[d] an applicable specialty."  (R. at 23.)  The Court must therefore determine whether the ALJ stated "good reasons" for assigning less than controlling weight to Dr. Iqbal's opinion.  (*See* Discussion, *supra*, at Section I(C).)

Plaintiff claims that, "[a]lthough some [of Dr. Iqbal's] treatment notes show examinations where [Plaintiff] was doing better, there are many other[s] that reveal more severe symptoms."  (Pl. Mem., at 8.)  This Court recognizes that certain mental illnesses, including bipolar disorder, involve symptoms that may wax and wane from day to day or week to week, such that a claimant would naturally have some days that are better than others.  *See Estrella v.*

*Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (noting that "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working" (internal quotation marks and citation omitted)); *see also supra*, at n.4.  This Court, however, simply cannot find any occasion on which, in his treatment notes, Dr. Iqbal ever characterized any of Plaintiff's symptoms or conditions as marked or severe.  In fact, as described in greater detail above (*see* Background, *supra*, at Section B(1)), Dr. Iqbal consistently recorded that Plaintiff exhibited or reported "mild" or "some" mood lability, "mild" depression (*see* R. at 290, 305, 307, 316, 319, 322, 337, 349, 352, 355, 358, 361, 364, 367, 388, 390), and, sporadically, "some" anxiety, "decreased" sleep, "some" difficulty concentrating, and "decreased" socialization (*see id.* at 281, 287, 316, 319, 322, 325, 373).  Although Dr. Iqbal remarked in June 2014 that Plaintiff "seem[ed] to have multiple breakthrough symptoms" (*id.* at 382) (symptoms that can be severe (*see supra*, at n.15)), none of Dr. Iqbal's other notes, over time, appear to describe any such symptoms, and, in 2017, he specifically noted that Plaintiff suffered from "no acute depressive or manic episode[s]" (R. at 278).  The mild symptoms more often described in Dr. Iqbal's notes appear to represent the worst of what Plaintiff typically experienced, and, as the ALJ pointed out (*see id.* at 23), there were many occasions on which Dr. Iqbal's notes suggest that even those symptoms had abated (*see, e.g.*, *id.* at 284 (Plaintiff "sleeping better"), 308-09 (Plaintiff "feeling better" and having "less mood lability"), 352 (Plaintiff "feeling better"), 370 (Plaintiff "feel[ing] much better," with his depression "much less")).  Additionally, the Court notes that the GAF score of 70 assessed by Dr. Iqbal at Plaintiff's initial visit (*id.* at 395), although perhaps not entitled to much weight, is indicative of mild symptoms (*see supra*, at ns.12, 28).

Furthermore, despite Plaintiff's insistence that the ALJ overlooked treatment notes evidencing more severe symptoms, his brief does not identify any such notes, and, in fact, his own summary of Dr. Iqbal's observations from 2014 to 2017 (*see* Pl. Mem., at 4) is entirely consistent with the ALJ's (*see* R. at 23). Plaintiff, for example, points to instances in which Dr. Iqbal described him as "mildly depressed" or as exhibiting "some difficulty concentrating" or "decreased socialization," but points to nothing that could be characterized as severe. (*See* Pl. Mem., at 4.) Additionally, Plaintiff urges that, given the illegibility of certain portions of Dr. Iqbal's notes, the Court "must rely" on the "summary" of Dr. Iqbal's treatment contained in the letter he wrote (to an unknown recipient) in August 2017. (*Id.*, at 8; R. at 242.) That "summary," however, simply lists Plaintiff's symptoms without describing their severity or frequency (R. at 242; *see also* Background, *supra*, at Section B(1)(b)), and, even if the letter could somehow be read to suggest more severe symptoms than are reflected in Dr. Iqbal's notes, Plaintiff has not adequately explained why that single page of evidence should require the Court to disregard four years of treatment notes in the Record.

Given that Dr. Iqbal's treatment notes reveal only mild symptoms of Plaintiff's bipolar disorder, the ALJ had good reasons for discounting Dr. Iqbal's opinion that Plaintiff suffered from marked limitations in all relevant areas of mental functioning. Indeed, courts have found treatment notes "show[ing] some depressed and anxious mood with occasional anxiety" to be inconsistent with marked mental limitations. *Rojas v. Astrue*, No. 09cv6698 (DLC), 2010 WL 1047626, at *7 (S.D.N.Y. Mar. 22, 2010); *see also Ruff ex rel. LMF v. Colvin*, No. 14cv2433, 2015 WL 694918, at *9 (S.D.N.Y. Feb. 18, 2015) (a finding that the claimant "had some limitations in a social setting and difficulty staying on track and focusing[ was] not an indication of marked limitations"). Additionally, the remarkably consistent, and largely normal, results of

34

Plaintiff's mental status examinations, which hardly changed at all from 2014 to 2017 (*see* Background, *supra*, at Section B(1)(b)), seemingly suggest that Plaintiff's condition was stable and adequately managed, further undermining Dr. Iqbal's opinion that Plaintiff suffered from marked limitations. *See Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 536 (S.D.N.Y. 2015) (affirming ALJ's decision to assign "little weight" to treating physician's claims of marked limitations when the physician's "[m]edical records show[ed] stable mental examinations and effective treatment with medication"); *Gomez v. Comm'r of Soc. Sec.*, No. 16cv4251 (WHP) (SN), 2017 WL 2124470, at \*13 (S.D.N.Y. Apr. 20, 2017) (finding that, despite plaintiff's "self[-]reporting of depressive symptoms, anxiety, and hypomanic symptoms" associated with her bipolar disorder, treating physician's assertion of marked limitations was inconsistent with "mostly normal" mental status examinations), *report and recommendation adopted*, 2017 WL 2126862 (May 16, 2017).

Accordingly, this Court finds that the inconsistency of Dr. Iqbal's opinion with his own treatment notes constituted a good reason for the ALJ to discount his opinion.

### b.    Dr. Iqbal's Opinion Is Also Inconsistent with Other Evidence in the Record.

In addition to the fact that Dr. Iqbal's opinion that Plaintiff suffered from "marked" limitations is inconsistent with his treatment notes – a fact that, even standing alone, would represent a good reason for assigning his opinion less than controlling weight, *see Rojas*, 2010 WL 1047626, at \*7 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) – the ALJ also cited several other reasons for discounting that opinion.  Specifically, the ALJ found that Dr. Iqbal's opinion was "not well supported by rationale, . . . and [was] contradicted by [Plaintiff's] conservative level of care, and [by Plaintiff's] testimony of activities of daily living."  (R. at 23.)  Although, without reliance on the opinion of a mental health specialist, the

ALJ has not shown a basis for characterizing Plaintiff's medication regimen as "conservative," her other additional reasons for discounting Dr. Iqbal's opinion are well-supported.

First, this Court understands the ALJ's reference to the "rationale" – or lack thereof – for Dr. Iqbal's opinion to be a reference to his sparsely annotated Medical Source Statement, the SSA-provided form on which Dr. Iqbal checked a series of boxes indicating that Plaintiff had "marked" limitations in 10 different areas.  (*Id.* at 431-32.)  As Defendant points out (Def. Mem., at 18), the Second Circuit has described a physician's responses to multiple-choice questions on such forms, standing alone, as "marginally useful," *Halloran*, 362 F.3d at 31 n.2.  Additionally, Dr. Iqbal's narrative comments on the same form do not shed light on his selections.  When twice prompted to "[i]dentify the factors . . . that support[ed] [his] assessment" (of "marked" limitations), Dr. Iqbal merely recited the symptoms of which Plaintiff had complained during his initial visit with Dr. Iqbal in March 2014.  (*See* R. at 391, 392-94, 432.)  Similarly, in his typewritten "summary" letter, Dr. Iqbal again noted the same symptoms, but did not elaborate further.  (*Id.* at 242.)  This Court finds that Dr. Iqbal's uninformative explanations of his opinion regarding Plaintiff's functional limitations undercut the value of that opinion and constituted a good reason for the ALJ's discounting it.

Second, the Record supports the ALJ's finding that certain aspects of Dr. Iqbal's opinion were inconsistent with Plaintiff's testimony regarding the effects of his mental impairments.  For example, although Plaintiff testified that his socialization was generally limited, that he spent most days at home, and that, on "bad day[s]," he would "bunker[] down" and not go anywhere, he never indicated that he had any problems with people in positions of authority.  (*See id.* at 42, 51.)  Plaintiff's mother's Function Report similarly stated that Plaintiff had not had "any problems getting along with bosses, teachers, police, landlords, or other people in authority."

(*Id.* at 182.)  Nevertheless, Dr. Iqbal opined that Plaintiff had "marked" limitations in his ability to "[i]nteract appropriately with supervisor(s)."  (*Id.* at 432.)  Likewise, Dr. Iqbal opined that Plaintiff was markedly limited in his ability to "[i]nteract appropriately with the public" (*id.*), even though Plaintiff stated that he used public transportation and went out occasionally, and did not otherwise indicate that he had difficulty interacting with the public (*id.* at 42, 44).  Dr. Iqbal's blanket assessment that Plaintiff had "marked" limitations in all applicable domains – even in areas where, based on Plaintiff's testimony, it is not clear that he had any limitations at all – suggests that Dr. Iqbal's opinion may not have been informed by actual reports or observations of Plaintiff's symptoms.

In sum, in addition to being inconsistent with his treatment notes, Dr. Iqbal's opinion is further undermined by the questionable rationale accompanying it and by Plaintiff's own testimony regarding the extent of his functional limitations, and the ALJ therefore did not err in assigning only slight weight to Dr. Iqbal's opinion.

## 2. The ALJ Did Not Commit Legal Error in the Weight She Assigned to the Other Medical Opinions in the Record.

As noted above, the ALJ's assessment of the other medical opinions in the Record was based largely on their consistency with findings, in Dr. Iqbal's treatment notes, of predominantly mild symptoms.  This Court has confirmed the accuracy of the ALJ's reading of the bulk of Dr. Iqbal's treatment notes and, for this and other reasons, finds that the ALJ's decision to give "some" weight to the opinions of Drs. Antiaris and Ferrin was well-supported.

In her decision, the ALJ noted that Dr. Antiaris's opinion that Plaintiff had some mild and moderate limitations in certain areas (*see* Background, *supra*, at Section B(3)) was based on a largely normal mental status examination (*see id.*) and was consistent with the mild symptoms recorded in Dr. Iqbal's treatment notes (R. at 22).  Indeed, the results of the mental status

examination performed by Dr. Antiaris were very similar to those consistently noted by

Dr. Iqbal.  (*See* Background, *supra*, at Sections B(1)(b), (3).)

Dr. Ferrin similarly opined that Plaintiff had mild or moderate limitations in some areas

(*see* Background, *supra*, at Section B(4)), and the ALJ also accorded that opinion "some" weight

based on its consistency with the medical evidence in the Record (R. at 24).  Although Plaintiff

rightly complains that, when Dr. Ferrin issued his report, he did not have access to Dr. Iqbal's

treatment notes, and that his review of the medical record was thus very limited (Pl. Mem., at 8),

this Court finds that this lack of access would not have affected Dr. Ferrin's opinion, as his

conclusions were nevertheless consistent with the largely mild symptoms described in

Dr. Iqbal's treatment notes.  Dr. Ferrin's opinion was also consistent with that of Dr. Antiaris, as

each found functional limitations primarily in the areas of concentration, maintenance of a

regular schedule, and social interaction.  (*See* R. at 65-66, 236.)

Based on their consistency with the medical evidence in the Record, and particularly with

Dr. Iqbal's treatment notes, this Court finds that it was not error to assign "some" weight to the

opinions of Drs. Antiaris and Ferrin.

**C.**    **Substantial Evidence Supports the ALJ's RFC Determination.**

Having determined that the ALJ did not commit legal error in the weight she assigned to

the medical opinion evidence, this Court also finds that the ALJ's RFC determination was

supported by substantial evidence.  In his testimony, Plaintiff described the primary symptoms of

his mental impairments as "exhaustion, sleep[,] depression, [and] concentration issues, . . . [and]

difficulties with talking to people."  (*Id.* at 38-39.)  The ALJ's RFC determination is not

inconsistent with the severity of these symptoms as evidenced by the medical record as a whole.

As to Plaintiff's concentration issues, there is scant evidence that his limitations were consistently as severe as Plaintiff alleged in his testimony, when he stated that he could not, for example, read more than a few pages before "want[ing] to . . . burst out of [his] seat." (*Id.* at 42.) Notably, in 40 appointments with Dr. Iqbal, Plaintiff complained of difficulty concentrating only twice, and neither of those complaints was made during the relevant period. (*See id.* at 370, 373.)  Additionally, on more numerous occasions, Plaintiff described certain activities to Dr. Iqbal that would seem to be inconsistent with severe limitations, such as the fact that he was writing a book (*id.* at 310, 355, 376) and that he intended to take college English courses (*id.* at 275, 278, 281).  Given that Plaintiff voiced so few complaints, it is unsurprising that, in Dr. Iqbal's Medical Source Statement, Dr. Iqbal did not even mention difficulty concentrating as one of Plaintiff's symptoms or impairments. (*See id.* at 432.)

Similarly, although it is clear, based on Dr. Iqbal's treatment notes, that Plaintiff consistently experienced "mild depression" before and during the relevant period (*see* Background, *supra*, at Section B(1)), the medical records contain no evidence of his experiencing severe depression, and also reflect that he never specifically complained of exhaustion, let alone exhaustion severe enough to render him unable to work.

The Record does reflect that Plaintiff made frequent complaints of insomnia and/or sleep apnea (*see id.*), but, again – and despite Plaintiff's testimony that sleep (and particularly falling asleep) was a "humongous problem" for him (R. at 39) – Dr. Iqbal's treatment notes do not indicate either of Plaintiff's sleep-related impairments ever became severe or unmanageable.  To the contrary, Dr. Iqbal characterized sleep as only "somewhat of a problem" for Plaintiff (*id.* at 355), did not prescribe any medication or treatment specifically to help Plaintiff sleep, and did not even describe insomnia or difficulty falling asleep as among Plaintiff's impairments or

symptoms in his Medical Source Statement (*id.* at 432).  There is also no indication in the Record that Plaintiff ever acted on Dr. Iqbal's recommendation that he undergo a sleep study for his sleep apnea.  (*See id.* at 327.)  Further, Dr. Iqbal's January 2016 comment that Plaintiff was "working on his sleep pattern" (*id.* at 322) seems to suggest that Plaintiff's issues falling asleep late and waking up in the afternoon could, at least to some extent, be managed by lifestyle changes and better sleep habits.  Finally, particularly in 2016 and 2017, Plaintiff's sleep-related complaints are interspersed with his reports that he was sleeping better.  (*See, e.g.*, *id.* at 284.)

Overall, while the Record documents that Plaintiff had some difficulties with concentration and sleep, supporting a finding that he was impaired in the domain of concentration, persistence, or pace, substantial evidence in the Record also supports the ALJ's determination that Plaintiff's impairment in this domain was not more than moderate and did not prevent Plaintiff from performing medium, unskilled work.  *See Del Carmen Fernandez v. Berryhill*, No. 18cv326 (JPO), 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (affirming ALJ's determination that moderate-to-marked limitations "in [the plaintiff's] ability to deal with stress, maintain a schedule, and make decisions . . .  were consistent with a capacity to perform medium exertion unskilled work" (internal citations omitted)); *Duffy v. Comm'r of Soc. Sec.*, No. 17cv3560 (GHW) (RWL), 2018 WL 4376414, at *19 (S.D.N.Y. Aug. 24, 2018) ("Mild or moderate limitations in concentration do not necessarily establish that a claimant is disabled, particularly where the ALJ limits the scope of work to unskilled, repetitive work."), *report and recommendation adopted*, 2018 WL 4373997 (Sept. 13, 2018); *Dillard v. Colvin*, No. 13cv6279 (LTS) (HBP), 2015 WL 556448, at *16 (S.D.N.Y. Feb. 6, 2015) (adopting report and recommendation) (evidence that Plaintiff performed some childcare duties and watched television "support[ed] the ALJ's finding that although plaintiff had some limitations on his

concentration and ability to interact with the public, plaintiff could, nevertheless, engage in unskilled work with only occasional interaction with the public").

Furthermore, as the ALJ's determination that Plaintiff could perform unskilled work was supported by substantial evidence, any error committed by the ALJ in not expressly incorporating Plaintiff's concentration limitation into his RFC was harmless. *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) ("[A] failure to incorporate non-exertional limitations in a hypothetical [that ultimately becomes a claimant's RFC] is harmless error if (1) medical evidence demonstrates that [the] claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and [2] the challenged hypothetical is limited to include only unskilled work." (internal quotation marks and citation omitted)).

Finally, to the extent Plaintiff had any difficulty interacting with others or performing complex work, the ALJ accounted for these limitations in the restrictions that she did incorporate into Plaintiff's RFC.  While noting that the medical evidence strongly suggested that Plaintiff was not significantly limited in most, if any, areas of mental functioning, the ALJ expressly erred on the side of caution and included restrictions in Plaintiff's RFC regarding his ability to make decisions, multi-task, and interact with others.  (R. at 20-21.)  These restrictions appear to be well-tailored to the medical evidence, as all three of the relevant medical opinions in the Record noted social-interaction limitations, and both Dr. Iqbal and Dr. Antiaris made findings related to Plaintiff's judgment, insight, and ability to perform complex tasks.  (*See e.g.*, *id.* at 235-36; Background, *supra*, at Sections B(1), (3).)

In sum, this Court finds that the ALJ appropriately considered the medical opinion and other evidence in the Record in making her RFC determination, and that that determination was supported by substantial evidence.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Plaintiff's motion for summary judgment (Dkt. 12) be denied; that Defendant's cross-motion for judgment on the pleadings (Dkt. 14) be granted; and that the decision of the Commissioner be affirmed.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Pauley. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         December 20, 2019

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)